# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2239

_____

Free and Fair Election Fund; Missourians for Worker Freedom; American Democracy Alliance; Herzog Services, Inc.; Farmers State Bank; Missouri Electric Cooperatives, doing business as Association of Missouri Electric Cooperatives; Association of Missouri Electric Cooperatives, PAC; David Klindt; Legends Bank; John Elliott,

*Plaintiffs - Appellees*,

v.

Missouri Ethics Commission; Don Summers, in his official capacity; Kimberly Benjamin, in her official capacity; George Ratermann, in his official capacity; Wayne Henke, in his official capacity; Liz Ziegler, in her official capacity,

*Defendants - Appellants*.[1]

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 10, 2018
Filed: September 10, 2018

_____

---

[1]Appellants Henke and Ziegler are automatically substituted for their predecessors under Federal Rule of Appellate Procedure 43(c)(2).

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.
_____

COLLOTON, Circuit Judge.

The Missouri Ethics Commission appeals the district court's[2] order permanently enjoining enforcement of a recently enacted provision of the Missouri Constitution. The provision, found in Mo. Const. art. VIII, § 23.3(12), prohibits a political action committee from receiving contributions from other political action committees. The district court concluded that the prohibition unconstitutionally infringed on a political action committee's First Amendment rights to freedom of speech and association. We agree and therefore affirm.

I.

On November 8, 2016, Missouri voters approved an amendment to the Missouri Constitution that added several provisions pertaining to campaign finance. The amendment took effect on December 8, 2016, *see* Mo. Const. art. XII, § 2(b), and was enacted as § 23 to Article VIII of the constitution.

At issue in this appeal is § 23.3(12), which provides in pertinent part: "Political action committees . . . shall be prohibited from receiving contributions from other political action committees . . . ." The amendment defines "political action committee" as

> a committee of continuing existence which is not formed, controlled or directed by a candidate, and is a committee other than a candidate committee, political party committee, campaign committee, exploratory

_____

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

committee, or debt service committee, whose primary or incidental purpose is to receive contributions or make expenditures to influence or attempt to influence the action of voters whether or not a particular candidate or candidates or a particular ballot measure or measures to be supported or opposed has been determined at the time the committee is required to file any statement or report pursuant to the provisions of this chapter.

Mo. Const. art. VIII, § 23.7(20). A "contribution" includes, among other things, a payment made "for the purpose of supporting or opposing the nomination or election of any candidate for public office or the qualification, passage or defeat of any ballot measure." Mo. Const. art. VIII, § 23.7(7).

The Missouri Ethics Commission investigates alleged violations of laws pertaining to campaign finance and enforces those laws. Among other things, the Commission is authorized to receive complaints that allege violations of campaign finance disclosure requirements, violations of the provisions of the Missouri constitution that relate to the official conduct of state officials, and violations of § 23.3 by a candidate for elective office. *See* Mo. Rev. Stat. § 105.957; Mo. Const. art. VIII, § 23.4(1). If the Commission has reasonable grounds to believe that a complaint shows a violation of criminal law, the Commission may refer the complaint for prosecution. *See* Mo. Rev. Stat. § 105.961.2; Mo. Const. art. VIII, § 23.4(4). The Commission has asserted that it "intend[s] to enforce Article VIII, Section 23 as required by law." R. Doc. 27, at 4-5.

After the amendment was approved, two Missouri political action committees (PACs)—Free and Fair Election Fund (FFEF) and the Association of Missouri Electric Cooperatives Political Action Committee (AMEC-PAC)—sued the Commission and its members to enjoin enforcement of § 23.3(12)'s ban on PAC-to-PAC transfers. FFEF receives contributions and makes independent expenditures to influence voters. FFEF alleged that it desired to accept contributions from other

PACs and to contribute to those PACs that make only independent expenditures. AMEC-PAC is a committee formed and maintained by AMEC, an association of nonprofit, member-owned rural electric cooperative membership corporations. AMEC-PAC alleged that it wished to accept contributions from and contribute to other PACs.

FFEF and AMEC-PAC sought declaratory and injunctive relief, alleging that the ban on PAC-to-PAC transfers was unconstitutional on its face under the First and Fourteenth Amendments, and unconstitutional as applied to each of them. After a hearing, the district court concluded that the transfer ban was unconstitutional on its face under the First Amendment and unconstitutional as applied to FFEF. It therefore permanently enjoined the Commission from enforcing that provision. The Commission appeals. Because the grant of injunctive relief turns on purely legal issues under the First Amendment, we review the district court's decision *de novo*. *See Qwest Corp. v. Scott*, 380 F.3d 367, 370 (8th Cir. 2004).

II.

The First Amendment protects the "right to participate in the public debate through political expression and political association." *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014) (plurality opinion). "When an individual contributes money to a candidate, he exercises both of those rights: The contribution 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 21-22 (1976) (per curiam)). Like individuals, PACs enjoy the right to freedom of speech and association. *See FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 492-96 (1985).

The ban on PAC-to-PAC transfers implicates these rights. By prohibiting a PAC from *receiving* contributions from other PACs, § 23.3(12) necessarily prohibits

-4-

a PAC from *making* contributions to other PACs.  Restricting the recipients to whom a PAC can donate therefore limits the donor-PAC's speech and associational rights under the First Amendment.

"When [a State] restricts speech, [it] bears the burden of proving the constitutionality of its actions." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 948 (8th Cir. 2018) (alterations in original) (quoting *McCutcheon*, 572 U.S. at 210).  Laws that regulate political contributions are subject to "exacting scrutiny." *McCutcheon*, 572 U.S. at 197; *Nixon v. Shrink Mo. Gov. PAC*, 528 U.S. 377, 387-88 (2000).  To meet that standard, the challenged law must advance a sufficiently important state interest and employ means closely drawn to avoid unnecessary abridgment of First Amendment freedoms. *Buckley*, 424 U.S. at 25.  A restriction on First Amendment freedoms is unconstitutional on its face if "no set of circumstances exists under which [the restriction] would be valid." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 891-92 (8th Cir. 2017); *see United States v. Stevens*, 559 U.S. 460, 472 (2010).

There is only one legitimate state interest in restricting campaign finances: "preventing corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 206.  This interest is limited to preventing "only a specific type of corruption—'*quid pro quo*' corruption" or its appearance. *Id.* at 207.  A large donation that is not made "in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to . . . *quid pro quo* corruption." *Id.* at 208.  Similarly, the general risk that a donor, through large donations, will "garner influence over or access to elected officials or political parties," either in fact or in appearance, is insufficient to create *quid pro quo* corruption. *Id.* (internal quotation marks omitted).  Instead, "the risk of *quid pro quo* corruption is generally applicable only to the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder." *Id.* at 211 (internal quotation marks omitted).

In this case, Missouri has not demonstrated a substantial risk that unearmarked PAC-to-PAC contributions will give rise to *quid pro quo* corruption or its appearance. Because the amendment defines a PAC as a committee that is "not formed, controlled or directed by a candidate," Mo. Const. art. VIII, § 23.7(20), PACs operate independently from candidates. "[T]here is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 572 U.S. at 210; *see also Citizens United*, 558 U.S. at 357. "When an individual contributes to . . . a PAC, the individual must by law cede control over the funds." *McCutcheon*, 572 U.S. at 210-11. If that PAC contributes the funds to a candidate, it is typically the PAC, not the individual, who receives credit for the contribution. If the PAC instead contributes the funds to another PAC, rather than to the candidate, "the chain of attribution grows longer, and any credit must be shared among the various actors along the way." *Id.* at 211.

The Commission asserts that without the ban on PAC-to-PAC transfers, a donor could evade the individual contribution limits of $2600 per candidate set forth in Mo. Const. art. VIII, § 23.3(1)(a). The evasion would occur, the argument goes, because a donor could contribute large, unearmarked sums of money to a candidate by laundering it through a series of PACs that he controls. The Commission says that circumvention of the contribution limits creates a risk of *quid pro quo* corruption or its appearance. It therefore contends that the ban advances the State's interest in preventing corruption by preventing circumvention of contribution limits.

The transfer ban, however, does little, if anything, to further the objective of preventing corruption or the appearance of corruption. The Commission does not "provide any real-world examples of circumvention" along the lines of its hypothetical. *McCutcheon*, 572 U.S. at 217. It does not point to evidence of any occasions before the amendment where PAC-to-PAC transfers led to the circumvention of contribution limits. Nor does the Commission identify any donors

-6-

who have exceeded contribution limits by using transfers among a network of coordinated PACs. The lack of examples is not surprising, for a donor determined to support a candidate with large sums of money need not employ PAC-to-PAC transfers. The donor may contribute *directly* to multiple PACs with the expectation that these PACs would support the donor's preferred candidate. Or, more practically, the donor may simply devote the full amount of contributions to independent expenditures in support of the preferred candidate without the suggested machinations. Why establish 385 separate PACs to donate $2600 each to a preferred candidate when the donor can spend $1 million independently to support the candidate? *See id.* at 213-14.

The Commission also contends that the transfer ban furthers the State's anti-corruption interest by promoting transparency. The Commission asserts that PAC-to-PAC transfers obscure the source of "large" donations and make it "nearly impossible for the Commission to enforce the State's individual contribution limits." In the Commission's view, exposing the source of these large donations discourages corrupt behavior and permits the Commission to detect violations of contribution limits. But the transfer ban does not materially further these objectives. Contribution limits already prevent "large" donations in excess of $2600 to a candidate by a single person, *see* Mo. Const. art. VIII, § 23.3(1)(a), and other provisions serve the State's interest in revealing efforts to contribute more. Donors are prohibited from contributing to PACs with the purpose of concealing the source, *see, e.g.*, Mo. Const. art. VIII, §§ 23.3(7) & (14), 23.7(19), and disclosure laws ensure that both the public and the Commission know the source of each donation. *See, e.g.*, Mo. Rev. Stat. §§ 130.041, 130.057.

The Commission urges us to follow the Eleventh Circuit in upholding a ban on PAC-to-PAC transfers. In *Alabama Democratic Conference v. Attorney General of Alabama*, 838 F.3d 1057 (11th Cir. 2016), the court reasoned that such a ban furthered the State's interest in preventing corruption or the appearance of corruption.

*Id.* at 1070. The court pointed to evidence that before such a ban, "PAC-to-PAC transfers were viewed by Alabama citizens as a tool for concealing donor identity, thus creating the appearance that PAC-to-PAC transfers hide corrupt behavior." *Id.* But the court also noted that Alabama law "does not limit the amount of money that a person, business, or PAC may contribute directly to a candidate's campaign." *Id.* at 1060. Unlike Alabama, Missouri limits the contributions that a PAC can make to a candidate, so the anti-corruption interest cited in support of the Alabama law is diminished here.

The transfer ban also is not closely drawn to serve an important state interest. Although the fit between the interest served and the means selected need not be perfect, it must be reasonable, with the means selected proportionate to the interest served. *McCutcheon*, 572 U.S. at 218. In this case, the risk of corruption from PAC-to-PAC transfers is modest at best, and other regulations like contribution limits and disclosure requirements act as prophylactic measures against *quid pro quo* corruption. The ban therefore amounts to the sort of "prophylaxis-upon-prophylaxis" that requires a court to be "particularly diligent in scrutinizing the law's fit." *Id.* at 221.

Assessing the fit of a proposed restriction requires consideration of available alternatives that would serve the State's interests while avoiding unnecessary abridgment of First Amendment rights. *See id.* As the Court explained in *McCutcheon*, anti-proliferation laws, including rules regarding affiliated PACs, are a less restrictive means of preventing the sort of abuse that concerns the Commission. If the State forbids a donor to create numerous PACs to support a candidate or to cause multiple PACs to coordinate their expenditures, then the Commission's hypothetical scenario would be unlawful. *See id.* at 211-13. Enhanced disclosure requirements, too, "often represent[] a less restrictive alternative to flat bans on certain types or quantities of speech." *Id.* at 223. The Commission asserts that additional disclosure requirements would not help the public to track the source of donations that are co-mingled with the rest of a PAC's funds and shuttled through a

series of other PACs before reaching a candidate. But even assuming the Commission is correct about the difficulty of tracking funds, the argument is self-defeating: If disclosure laws will not help the *public* discern who gave money to whom, then we are hard pressed to see how a *candidate* would identify an original donor to create a risk of *quid pro quo* corruption. AMEC PAC suggests that a limit on the size of transfers between PACs is another less restrictive alternative. The Commission argues that such a limit would not work, because donors would simply use more PACs. But if a limit were combined with anti-proliferation provisions, then the feared loophole would be closed. We do not here decide the constitutionality of these other, hypothetical laws that might be enacted, but the availability of less restrictive alternatives contributes to our conclusion that the current provision is not closely drawn. *See Green Party of Conn. v. Garfield*, 616 F.3d 189, 210 (2d Cir. 2010); *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996).

Taken together, the low risk of *quid pro quo* corruption stemming from PAC-to-PAC transfers, the existence of other campaign finance laws that facilitate transparency, and the availability of less restrictive alternatives to the ban suffice to show that § 23.3(12) is not closely drawn to serve a sufficiently important state interest. We thus need not explore other concerns, such as whether the ban is over-inclusive by prohibiting transfers between PACs that make only independent expenditures, or under-inclusive by permitting transfers between state PACs and federal PACs.

The district court properly enjoined enforcement of the transfer ban in its entirety. The amendment violates the First Amendment as applied to PACs that donate only to candidates and to PACs that both donate to candidates and make independent expenditures. The Commission argues that § 23.3(12) does not apply to PACs like FFEF that make only independent expenditures, but it is unnecessary to address that point. A State does not have a sufficiently important interest in preventing contributions to a PAC that makes only independent expenditures, *see*

*Citizens United*, 558 U.S. at 357-60, so the provision must be enjoined in its entirety whether or not it extends to this subgroup of PACs.

$$* \qquad * \qquad *$$

The judgment of the district court is affirmed.

_____